JEHU HARLAN *v.* JAMES HARLAN et al.

Insolvency — Preferred Creditors — Assignment — Statute of 1856.

Two essential facts must exist before a sale by a debtor will operate as an assignment for the benefit of creditors under the Statute of 1856. First, the insolvency of the vendor; second, that the sale was made to prefer a creditor.

APPEAL FROM BOYLE CIRCUIT COURT.

February 16, 1866.

OPINION BY THE COURT:

The antenuptial contract of July 12, 1839, between James Harlan and his wife, made in contemplation of marriage, secures to her all her individual property, free from the control of her husband, and provides that she is to have no dower in his estate, but the same is to remain entirely under his control, free from any legal claim or interest on her part as wife. He, however, stipulated to support her during their joint lives, and if she should survive him to secure to her by will or otherwise $3,000 during her life to be returned to his estate after her death.

The covenant to support her was but undertaking what the law would impose on him as a duty when he became husband, and the stipulation to secure her the use of $3,000 for her life was dependent on the contingency of her survivorship, and was but a personal undertaking or covenant; it certainly gave her no lien or other interest in any specific property he then had. Jehu Harlan sued James Harlan on a debt of about $2,600 January 19, 1863, and obtained judgment February 6th; sued out execution the next day, which was returned by the proper officer, no property found, March 15, 1863.

January 23, 1863, James Harlan conveyed to his wife for life all his slaves in consideration of said antenuptial contract, and four days thereafter conveyed to Charles Engleman, John Engleman, and Jacob Harlan his tract of land in Boyle county of 380 acres at $40 per acre cash, as set out in the deed of conveyance.

These gentlemen were the sureties of James Harlan to the Bank of Danville in the sum of $3,678, due January 20, 1863, and Charles Engleman and Jacob Harlan were his sureties in a debt of $7,454.84, due April 12, 1863, to the Bank of Kentucky.

James Harlan admits in his answer he then owed about $25,000. His farm and slaves seems to have constituted his entire estate in Kentucky.

Charles Engleman the day before the conveyance of the farm gave to James Harlan a check on the Branch Bank of Kentucky at Danville for $7,361.16, which seems to have been the precise amount of James Harlan's indebtedness to the bank, in which said Engleman and Jacob Harlan were the sureties when the interest for the unexpired term which the note had to run was deducted from it, as is shown by the cashier's memorandum of calculation on said check. James Harlan paid said note with Engleman's check, although but little more than one-third of the time which the note had to run had expired.

The consideration of the farm as set out in the deed was $15,200; the two bank debts amounted to $11,039.16. What James Harlan did with the remainder he does not attempt to show, except by a general statement that he paid it out to creditors, but to whom he neither explains by answer nor proof.

The Englemans and Jacob Harlan say in their answer that John Engleman and Jacob Harlan have sold their interest in the land to Christian Engleman and that he is the sole owner.

Christian Engleman became the immediate, direct creditor of James Harlan on January 26, 1863, to the amount of $7,361.16, hence when he received the conveyance of the land the next day he was James Harlan's creditor and this indebtedness was a part of the consideration for the conveyance. That James Harlan was then insolvent and so regarded himself is most apparent from the circumstances. He had been sued by Jehu Harlan four days before he conveyed all his slaves to his wife, under the pretense of complying with his antenuptial contract of July, 1859. He sold his land to his sureties in bank eight days after being sued, and settled a debt then lacking nearly three months of being due for $7,361.16, and a return of no property is made against him before this debt would have fallen due.

He acknowledges an indebtedness of $25,000, yet neither explains nor proves payment of any save the bank debts which were less than half this amount, and in this situation he conveys all his tangible property in Kentucky, and then attempts to escape from the legal conclusion of insolvency by saying he had some $25,000 of southern debts due him which he could not collect because of the Civil War then raging. As the state of war, then not apparently near its close, rendered these claims precarious it is rather an evidence of insolvency than of solvency and aids in connection with the other parts in explaining the motives both of Harlan and his sureties in making this conveyance.

This court has repeatedly said a man must be presumed to have a reasonable knowledge of his affairs and when largely unable to pay his debts must be presumed to know his situation; in this case, however, James Harlan discloses his knowledge of his affairs, and that he fully knew and understood that his property in Kentucky was greatly inadequate to the payment of his debts.

The inference from the sale of John Engleman and Jacob Harlan of their interest in the land to Christian Engleman is that they were not purchasing for their own use, but the reasonable inference is that they purchased because they were his sureties and by making the purchase the debts for which they were liable would be paid. Christian Engleman doubtless knew that the debt to the Branch Bank of Kentucky was paid, and his check being for the precise amount of said debt when over two months' interest should be deducted raises the inference that he must by some means have known its precise amount and that his check would

pay it; be this, however, as it may, it made him a creditor, and, therefore, the two essential facts under our Statute of 1856 is made out, first, the insolvency of the vendor; second, that the conveyance was made to prefer a creditor, which it most unequivocally does in this case. The conveyance to Mrs. Harlan is now of but little consequence, as the slaves have ceased to be of value, save to show the *animus* with which those conveyances were made.

The conveyance of the land to the Englemans and Jacob Harlan was made in contemplation of insolvency and to prefer them to other creditors and, therefore, comes within the operation of the Statute of 1856, and inured to the benefit of all the creditors of James Harlan; the court should sell the land, and divide the proceeds *pro rata* among the creditors of James Harlan who may present their claims for liquidation.

For these reasons the judgment dismissing plaintiff's petition must be reversed, with directions to the court below for further proceedings in conformity to this opinion. Mrs. Harlan should be permitted to present her contingent claim and to have her rights adjudicated on equitable principles.